UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JASON DEAL and ROBERT LAHR,

                          Plaintiffs,             **No. 07-CV-6497(MAT)**

     -vs-                              **DECISION and ORDER**

SENECA COUNTY, a municipal corporation,
the SENECA COUNTY SHERIFF'S DEPARTMENT,
LEO T. CONNOLLY, Individually and in
his official capacity as SENECA COUNTY
SHERIFF, the SENECA COUNTY DISTRICT
ATTORNEYS OFFICE, RICHARD SWINEHART,
Individually and in his official capacity
as SENECA COUNTY DISTRICT ATTORNEY, JAMES
LARSON, Individually and in his Capacity
as Undersheriff of Seneca County,

                          Defendants.

_____

## I.   Introduction

Represented by counsel, plaintiffs Jason Deal ("Deal") and Robert Lahr ("Lahr") filed this action pursuant to 42 U.S.C. § 1983 against defendants Seneca County ("the County"), the Seneca County Sheriff's Department ("the Sheriff's Department"), Seneca County Sheriff Leo T. Connolly ("Connolly"), the Seneca County District Attorney's Office ("the SCDA"), former Seneca County District Attorney Richard Swinehart ("Swinehart"), and former Seneca County Undersheriff James Larson ("Larson"). At all relevant times, plaintiffs Deal and Lahr have been employed, and continue to be employed, as criminal investigators by the Sheriff's Department.

The claims presently pending against the County, the Sheriff's Department, Larson, and Connolly involve alleged retaliation

-1-

against plaintiffs for exercise of their First Amendment rights.

Specifically, in their Amended Complaint,[1] plaintiffs allege that defendants harassed, intimidated, and took adverse employment actions against them in an attempt to quash their rights to speak out regarding matters of public concern. Also pending are plaintiffs' claims alleging the intentional infliction of emotional distress ("IIED") against Connolly only. Swinehart and the SCDA are no longer defendants in this action. See Decision and Order dated February 26, 2009 (Docket No. 61) (denying without prejudice plaintiffs' motion to amend to include claims of retaliation against defendants Swinehart and the SCDA for the violation of their First Amendment rights, as set forth in plaintiffs' Second and Fifth  Causes of Action of the Proposed Amended Complaint).

After the close of discovery, the remaining defendants all filed motions for summary judgment pursuant to Fed. R. Civ. P. 56. Defendants argue that the First Amendment retaliation claims should be dismissed as a matter of law because plaintiffs did not speak as private citizens but rather as public employees, no adverse employment action was taken against plaintiffs, and any adverse employment action was not causally connected to the speech at issue. Larson and Connolly contend that they are entitled to

---

[1]

By Decision and Order dated May 8, 2008, the Court dismissed plaintiffs' Fourth Amendment claims and their claims alleging substantive and procedural due process violations under the Fourteenth Amendment. See Decision and Order dated May 8, 2008 (Docket No. 26).

qualified immunity, while the County and the Sheriff's Department assert the defense of limited municipal liability under 42 U.S.C. § 1983.   Larson also argues that he lacked the supervisory authority over plaintiffs to engage in the retaliatory conduct alleged. Connolly contends that plaintiffs have not alleged conduct that qualifies as extreme and outrageous for purposes of establishing a claim of IIED.

Plaintiffs have opposed each defendants' motion for judgment on the pleadings. The matter is now fully submitted and ready for decision. For the reasons that follow, defendants' motions for summary judgment are granted, as there are no genuine issues of material fact with regard to the First Amendment retaliation claims. In particular, the Court finds that plaintiffs have not established the required elements of "adverse employment action" and causation. With regard to the IIED claims, the Court finds that plaintiffs have not establish a prima facie case. Therefore, the Amended Complaint is dismissed in its entirety.

## II.  Factual Background

### A.   Overview

Because of the procedural posture of the case, the Court reviews the facts in the light most favorable to the non-moving party. Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed [when

resolving a summary judgment motion], and all justifiable inferences are to be drawn in his favor.") (citation omitted)). Accordingly, the following facts, unless otherwise noted, are undisputed or drawn from plaintiffs' testimony and affidavits. In the event of a dispute, the facts are construed in the light most favorable to plaintiffs. E.g., Anemone v. Metropolitan Transp. Auth., 629 F.3d 97, 99 n.1 (2d Cir. 2011) (citation omitted).

Plaintiff Lahr became an Investigator with the Sheriff's Department's Criminal Investigations Department ("CID") in 1996, and plaintiff Deal became an Investigator with the CID in 2000. Defendant Connolly was elected to the position of Seneca County Sheriff in November of 2003 and served a four-year term as Sheriff from January 1, 2004, through December 31, 2007. Defendant Larson became a full time deputy at the Sheriff's Department in October of 2000; was appointed Undersheriff by Connolly in 2004; and, effective January 1, 2006, stepped down to the position of Road Deputy and was no longer in a position superior to plaintiffs in the Sheriff's Department hierarchy. Larson left the Sheriff's Department on March 1, 2006.

### B. Plaintiffs' Investigations

#### 1. The Preferred Auto Investigation by Plaintiff Lahr

In the late 1990s and early 2000s, Preferred Auto ("PA") provided automotive maintenance and repair services for the Sheriff's Department's vehicles. Lahr noticed that when he brought

his County-issued vehicle to PA for an oil change, the oil and oil filter were not being changed, but the County nevertheless was being charged. On his own initiative, and without notifying his supervisors, Lahr began an investigation of PA and gathered proof that PA was defrauding the Sheriff's Department. Lahr's investigation continued through 2003. At that time, then-sheriff Tom Fox ("Fox"), a close friend of PA's owner, learned of Lahr's activities. Lahr asserts that Fox ordered him to stop and threatened to fire him, although Lahr admits that Fox did not fire, suspend, discipline, or demote him.

The New York State Attorney General's Office ("the AG's Office") eventually began conducting an investigation into PA's business practices. Lahr did not contact the AG's Office; he surmised that Jim Stevers, who owned another local auto repair business and had had problems with PA, informed the AG's Office about PA. Lahr could only recall that the official investigation occurred between 2000 and 2004, and he thought that Fox was still Sheriff. In any event, Lahr spoke with two representatives from the AG's Office during work hours at the CID office. This conversation is one instance of speech which Lahr claims resulted in retaliatory treatment. Lahr admits, however, that the PA investigation "had nothing to do with [Connolly]," as it occurred prior to Connolly's tenure as sheriff. Deposition of Robert Lahr ("Lahr Dep.") at 80:15-22.

### 2.   **The Illegal Deer Hunt at Seneca Falls Army Depot**

In 2005, Lahr learned that the Sheriff's Department was offering its members a security detail patrolling a deer-hunt at Seneca Falls Army Depot ("the Depot"). The Sheriff's Department members who signed up were permitted to hunt deer while being paid to act as security. Concerned that this was illegal and at least unethical, Lahr attempted to sign up for these details to monitor what was occurring. Although, based on his seniority and availability, Lahr should have received a security detail assignment, he never received a response to his request and was not afforded the opportunity to participate. Later, the deputy sheriff who had sent out the email concerning the security detail, Chris Constable ("Constable"), told Lahr that he "didn't get to go . . . because the sheriff [Connolly] and undersheriff [Larson] were pissed off at [him] for some reason[.]" Lahr Dep. at 106:13-17.

Believing that his only course of action was to refer the matter to an outside law enforcement agency, Lahr then contacted Federal Bureau of Investigation ("FBI") Agent Mark Thompson ("Thompson"), with whom he had worked in the past. Lahr met Thompson, off-hours, at a McDonald's parking lot and informed Thompson of his suspicions. Lahr did not know what, if anything, the FBI did in response to his allegations although he believes that the FBI did investigate. Lahr did not know whether he told Connolly, Larson, or Constable about his conversation with

Thompson. He did not remember whether anyone told him that these individuals had been informed by someone else that he had spoken with the FBI. See Lahr Dep. at 108:20-109:3; 110:23-111:3. Lahr assumed that they somehow must have found out about it. Id. at 111:9-12 ("I don't think that they would have had this campaign of harassment against me and Jason [Deal] for no reason. They obviously knew something was going on or why would they be coming after us.").

### 3. Plaintiffs' Investigation into the Theft of County Property

In 2005, Lahr and Deal became suspicious that members of the Sheriff's Department, including Larson and Deputy Sheriffs Constable, Josh Zona ("Zona"), and Scott Buck ("Buck"), were stealing County property. Plaintiffs also learned that Larson, who had resigned from his position as Undersheriff, was arranging for sheriff's deputies to perform civilian duties while on county time and then paying them out-of-pocket for this work.

Lahr and Deal began their own investigation into the matter, without informing any of their supervisors. Through the course of the investigation, Plaintiffs discovered some of the County property at issue had been held in a storage facility at Sampson State Park. Larson, along with Constable, Zona, and Buck, were responsible for transferring the property to the Seneca County Army Depot ("the Depot") in the late summer or fall of 2005. Plaintiffs also learned that Larson had moved the PA invoices to the Depot.

In late January of 2006, Plaintiffs Deal and Lahr decided to inform their immediate supervisor, Lieutenant James Spike ("Spike"), what they had discovered. Plaintiffs were authorized to continue their confidential inquiries, although Plaintiffs claim they were expressly denied permission by Spike to interview Larson and Zona. Ultimately, as a result of plaintiffs' investigation, Connolly determined that Larson would be arrested and criminally prosecuted. With respect to the other Sheriff's Department members involved in the theft, Connolly deferred decision on whether to handle their misconduct administratively or through criminal prosecution.

In the meantime, on February 5, 2006, a fire of suspicious origin occurred at the Depot, damaging or destroying evidence relating to the stolen County property and the PA invoices. At that point, Connolly notified the New York State Police and requested their assistance because Larson, who was still employed as a road deputy, was the primary suspect.

The investigation was turned over to the State Police, who executed a search warrant on Larson's home on February 7, 2006. Larson ultimately was arrested and charged with several crimes. He pled guilty to petit larceny, grand larceny, possession of stolen

property, and official misconduct.[2] Four deputies also were charged criminally.

### C.    The Instances of Protected Speech

Plaintiff Lahr claims that he engaged in protected speech when he was interviewed by Ontario County District Attorney's Office Special Investigator Michael Tantillo ("Tantillo") regarding Tantillo's investigation into the theft of County property. He also asserts he engaged in protected speech when he testified before the grand jury impaneled in connection with the investigation.

Deal claims that he engaged in speech when he tried to contact the New York State Office of Governmental Affairs and the New York State Civil Service to report his investigative findings regarding the theft of County property. However, neither of these agencies ever returned his calls.

Deal claims that he engaged in speech when he spoke with Patsy Amidon ("Amidon"), the Town Supervisor of Tyre, in Seneca County, on five or six occasions during non-work hours, about information he had obtained in the course of his and Lahr's investigation in an attempt to gain her assistance. To Deal's knowledge, Amidon did nothing with the information he provided. Deal also admitted that he did not know whether Connolly and Larson ever learned he had spoken to Amidon.

---

[2]

Although plaintiffs believe that Larson set the blaze, to date the cause of the fire has not been established, and no charges have been brought against anyone with respect to the fire.

Finally, both plaintiffs also spoke with the press, specifically Craig Fox ("Fox"), a reporter with the Finger Lakes Times ("the FLT"), on numerous occasions both during and after the investigation concluded. The FLT published reports concerning the theft of County property and the warehouse fire, based partially on information that Plaintiffs provided to them, both before and after they concluded their investigation. Both plaintiffs told Fox that the Sheriff's Department was attempting to cover-up and halt the investigation into the theft of County property and that then-D.A. Swinehart was maneuvering to protect certain people involved in it. Fox published this information in his reports.

### D.   The Retaliatory Conduct

The adverse employment actions alleged by plaintiffs are discussed in detail, <u>infra</u>, at Section IV.B.2.

## III. Summary Judgment Standard

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("F.R.C.P."). Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

-10-

Judgment on the pleadings is warranted when the party opposing the motion has no evidentiary support for an essential element on which it bears the burden of proof. Celotex, 477 U.S. at 322-23. The non-moving party may not rely on evidence that is merely colorable, conclusory, or speculative but must come forward with "concrete evidence from which a reasonable jury could return a verdict in [his or her] favor." Anderson, 477 U.S. at 256.

IV.   **The First Amendment Rights of Public Employees**

   A.   **Elements of a Prima Facie Case of Retaliation**

The standard for assessing when the speech of a public employee is protected from retaliation by the First Amendment "entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" Ruotolo v. City of N.Y., 514 F.3d 184, 188 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)); accord Anemone v. Metropolitan Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011). "To survive summary judgment on a First Amendment retaliation claim, a public employee 'must bring forth evidence showing that he has [1] engaged in protected First Amendment activity, he [2] suffered an adverse employment action, and [3] there was a causal connection between the protected

activity and the adverse employment action.'" <u>Anemone</u>, 629 F.3d at 114 (quoting <u>Dillon v. Morano</u>, 497 F.3d 247, 251 (2d Cir. 2007)).

### 1.    Protected Speech

Where the employee makes statements pursuant to his official duties, he is not speaking as a private citizen for First Amendment purposes and the Constitution does not insulate his communications from employer discipline. <u>Garcetti v. Ceballos</u>, 547 U.S. at 421-22. The fact that the speech may have been made inside or outside of his workplace is not dispositive. <u>Id.</u> Rather, "whether the speech was made as an employee or private citizen entails an examination of the content, form, and context of [the] statement, as revealed by the whole record." <u>Rankin v. McPherson</u>, 483 U.S. 378 (1987)).

### 2.    Adverse Employment Action

The Second Circuit clarified in <u>Dillon v. Morano</u> that "the proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" 497 F.3d at 54 (quoting <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted in <u>Dillon</u>)). A number of employment actions have been specifically identified by the Second Circuit as "adverse", such as discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. <u>E.g.</u>, <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir.

1999). The possibility remains open that lesser actions may meet the adversity threshold, although the Circuit has "not explicitly defined what quantum of lesser actions constitutes an adverse employment action." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002) (internal quotation marks and citations omitted).

### 3.  Causal Connection

For First Amendment purposes, "[t]he causal connection [between the adverse action and the speech] must be sufficient to support the inference 'that the speech played a substantial part in the employer's adverse employment action.'" Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 780-81 (2d Cir. 1991)). "A plaintiff may prove causal connection between plaintiff's protected activity and defendant's adverse action either directly or indirectly." Phillippeaux v. Fashion Inst. of Tech., No. 93 Civ. 4438, 1996 WL 164462, at *8 (S.D.N.Y. Apr. 9, 1996), aff'd, 104 F.3d 356 (2d Cir. 1996). Evidence that a defendant possessed a retaliatory animus against the plaintiff constitutes direct proof. See DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965 (1987). "Indirect proof may consist of either disparate treatment of fellow [employees] engaged in similar conduct or proof that adverse action by defendant closely followed protected activity." Phillipeaux, 1996

WL 164462, at *8 (citing, <u>inter alia</u>, <u>DeCintio</u>, 821 F.2d at 115; other internal citations omitted).

Although the timing of the alleged adverse actions may be sufficient to raise an inference of a causal connection, it will not always suffice. <u>Brown v. Time, Inc.</u>, No. 95 Civ. 10081(MBN), 1997 WL 231143, at *8 (S.D.N.Y. May 7, 1997) (citing, <u>inter alia</u>, <u>Ali v. Mount Sinai Hosp.</u>, No. 92 Civ. 6129, 1996 WL 325585, at *9 (S.D.N.Y. June 12, 1996)).  To prove a causal connection, the plaintiff must demonstrate that the individuals who engaged in retaliation had knowledge of the protected conduct. <u>See</u>, <u>e.g.</u>, <u>Cohen v. Fred Meyer, Inc.</u>, 686 F.2d 793, 797 (9th Cir. 1982) (dismissing retaliation claim where decisionmaker had no knowledge that employee was engaged in protected activity).  Although causation is normally an issue of fact, "a court may decide that a reasonable jury can reach only one conclusion, and decide the issue as a matter of law." <u>Perrin v. Hilton Intern., Inc.</u>, 797 F. Supp. 296, 299-300 (S.D.N.Y. 1992) (citations omitted).

### B.   Analysis of Plaintiffs' Claims

####  1.   Plaintiffs are not required to show an actual chilling effect as the result of the alleged adverse employment actions.

Defendants argue that because plaintiffs continued to speak after the retaliatory conduct commenced, they cannot make out a <u>prima facie</u> case. Defendants are applying the incorrect standard. The Second Circuit has not held that "'a public employee plaintiff

is required to show that the defendants' action <u>had</u> an actual chilling effect.'" <u>Zelnik</u>, 464 F.3d at 226 n.2 (quotation omitted; emphasis in <u>Zelnik</u>); <u>see also</u> <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 382 (2d Cir. 2004) ("[D]efendants are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech. In the employment context, under this framework, the harm is some concrete diminution in job responsibilities, security, or pay-up to and including termination."). Plaintiffs thus do not need to demonstrate that they actually were deterred from speaking by defendants' alleged retaliatory conduct in order to establish an adverse employment action.

> **2.  The plaintiffs have failed to show more than <u>de minimis</u> adverse actions or that there was a causal connection between the speech and the alleged adverse action.**

Applying the proper standard, <u>see</u> <u>Zelnik</u>, 464 F.3d at 226 n.2, the Court cannot find the alleged acts constitute "adverse employment actions." <u>See</u> <u>Dillon v. Morano</u>, 497 F.3d at 254. In the First Amendment context, "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999); <u>accord</u>, <u>e.g.</u>, <u>Zelnik</u>, 464 F.3d at 226. The Court notes, at the outset, that neither plaintiff was ever fired, demoted, suspended, subjected to disciplinary proceedings, subjected to

having a grievance filed against them, or required to be the subject of a formal hearing. Neither plaintiff suffered a failure-to-promote, a reprimand, or negative evaluations. Neither plaintiff sustained a reduction in pay or lost employment-related privileges.

As noted above, the Second Circuit has stated that "lesser actions may also be considered adverse employment actions" but it has not defined what these are. Morris, 196 F.3d at 110 (citing Bernheim v. Litt, 79 F.3d 318, 324-26 (2d Cir. 1996)); accord Zelnik, 464 F.3d at 226. The general rule is that "whether an undesirable employment action qualifies as being 'adverse' is . . . heavily fact-specific [and] . . . contextual . . . ." Zelnik,464 F.3d at 226 (quoting Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir. 2006) (finding that "the prospect of a wholesale reassignment of job duties, to the extent that occurred here, could 'deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights'") (quotation omitted). However, a plaintiff cannot support such a determination with alleged acts of retaliation that are no more than de minimis. Cf. Davidson v. Chestnut, 193 F.3d 144, 150 (2d Cir. 1999) (declining to reverse district court's denial of summary judgment on a prisoner's First Amendment retaliation claim, instead remanding for consideration of the factual question "whether the alleged acts of retaliation . . . were more than de minimis") (citing, inter alia, Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999); Bart v. Telford, 677

F.2d 622, 625 (7th Cir. 1982) ("Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . .") (citations omitted)). The Court discusses the plaintiffs' asserted adverse employment actions in turn below.

### a.   Criticism Directed at Plaintiffs' Attire

Both plaintiffs testified that they were subjected to heightened scrutiny based upon the way they dressed for work in that the office dress code was selectively enforced with regard to them. See, e.g., Deposition of Jason Deal ("Deal Dep.") at 126:15-127:5; Lahr Dep. at 149:2-15. Lahr identified only one specific occasion, on which Spike allegedly wore sweat pants to work. See Lahr Dep. at 149:2-15. Deal, on the other hand, testified that he and Lahr "were checked on daily" to make sure that they were in compliance with the departmental dress code-i.e., their shoes were clean, their pants were of the right type, and they were wearing a shirt and tie at all times. Deal Dep. at 126:16. According to Deal, Lieutenant John Cleere regularly wore black jeans and a polo shirt with a baseball hat; Spike always wore sweat pants with black sneakers and a polo shirt; and another CID investigator, Kip Goodman, was never criticized on the rare occasion he did not wear a tie.

Taking plaintiffs' allegations as true–that there was selective enforcement of the dress code–and assuming that such conduct could constitute an adverse employment action, see See Ali v. Mount Sinai Hosp., 1996 WL 325585, at *3, 6-7, the Court nevertheless cannot find that plaintiffs have raised a triable issue of fact on the issue of whether there was an adverse employment action under the present circumstances. Although plaintiffs are not required to prove an actual chilling effect, the Court finds it significant that both plaintiffs continued with their investigations into criminal activity and engaging in speech, notwithstanding the alleged selective enforcement of the dress code.

Furthermore, plaintiffs have not raised a triable issue as to causation, since they admit were being scrutinized with regard to their work attire both before and after the investigations and speech. E.g., Deal Dep. at 132:8-21. See Bernheim v. Litt, 79 F.3d at 325 ("Clearly, [plaintiff-teacher] may not base her claim of retaliation upon complained-of acts that predated her speaking out about [her school principal's] alleged misrepresentations.") (citing Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994) ("In particular, the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.").

### b.    Relocation of Plaintiffs' Offices

Both plaintiffs testified that their offices were relocated to the basement and that this was done to punish them for their First Amendment speech. Defendants argue that this does not constitute an "adverse employment action", citing <u>Dillon</u>, 497 F.3d at 255, in support of this claim. This mischaracterizes <u>Dillon</u>. Contrary to defendants' suggestion, the Second Circuit in <u>Dillon</u> agreed with the district court which found that these actions were adverse for First Amendment purposes but were not substantially motivated by the plaintiff's exercise of speech and therefore did not establish retaliation. <u>Dillon</u> 497 F.3d at 255.

Assuming that the office relocation was an adverse employment action, Deal and Lahr must show facts warranting an inference that the protected speech was a substantial motivating factor in the adverse employment action in order to establish a causal connection between their offices' relocation and their speech. <u>Morris</u>, 196 F.3d at 110.

Lahr testified that he was moved to the basement office "[s]omewhere between 2005 and 6 maybe", and that Deal's office was moved to the basement at the same time. Lahr Dep. at 161:1-10. Deal admitted that he did not remember the exact date, stating that the move "would have been [in] 2006." Deal Dep. at 134:7-9. Deal later testified that the move occurred in the "2005-2006 timeframe" and

finally clarified that it was in the fall of 2005. Deal Dep. at 235:6-14.

Plaintiffs have failed to come forward with direct or indirect proof of a causal connection. Both plaintiffs admit that they were never informed that their offices were being moved because of their investigation and speech. Also, plaintiffs were not the only investigators in the CID who either had their offices locatedbasement all along, or who also had their offices moved to the basement. Deal Dep. at 134:12-21; Lahr Dep. at 161:12-20. Deal admitted that Spike and Vancleef, the acting lieutenant,[3] were moved to offices in the basement at some point after Deal and Lahr moved. Deal Dep. at 134:12-21; Exhibit F, 93:12-15. Lieutenant John Cleere, a member of the CID during the relevant time frame, had been working from his office in the basement since 1996. He testified that neither plaintiff ever complained to him that he believed he was being penalized by being moved to the basement. Deposition of John Cleere ("J. Cleere Dep.") at 49:17-24; 57:21-58:3. Thus, plaintiffs cannot demonstrate that they were singled out for negative treatment by having their offices moved to the basement. In other words, there is no indication that their investigations and related speech were a motivating factor in the decision to move their offices.

---

[3]     The Court also notes that since the Sheriff's Department moved into their new space, plaintiffs no longer have baesment offices.

In addition, Deal testified that his office was moved to the basement in the fall of 2005, <u>before</u> Deal engaged in speech beginning in January 2006 regarding his and Lahr's investigation into the theft of County property. <u>E.g.</u>, Deal Dep. at 109:18-110:3. However, a claim of retaliation may not be premised upon adverse actions that occurred before the protected speech. <u>See</u> <u>Bernheim</u>, 79 F.3d at 325.

### c.   Criticism of Plaintiffs' Work

Plaintiffs assert in their Opposition Memorandum of Law ("Pl. Opp. Mem.") that  while they were "admittedly under additional scrutiny due to their willingness to speak out against police corruption . . . this scrutiny intensified after Plaintiff Lahr spoke to Agent Thompson and especially after both Plaintiffs went to the press . . . regarding the stolen property." Pl. Opp. Mem. at Point I.B (citing Lahr Aff. 30; Deal Aff. 19). Plaintiffs refer to "hypercritical comments" in their Memorandum of Law but do not elaborate or point to specific examples from the deposition testimony. Plaintiffs may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985), <u>cert.</u> <u>denied</u>, 474 U.S. 829.

In reviewing plaintiffs' depositions, the Court found several instances of alleged criticism, but concludes they do not amount to "adverse employment actions." When questioned about what was

included in the Department being "hypercritical", Lahr responded that they were accused of "not working on cases correctly and work hours and clothing." Lahr Dep. at 177:4-9. Deal testified that Lieutenant Spike[4] and Acting Lieutenant VanCleef said their "investigations didn't go fast enough, [they] didn't have enough arrests for the month, . . . [and] [they] were not using [their] work time effectively. Deal Dep. at 124:13-17. Deal, however, admitted that even before his investigation into the theft of county property and related speech, he was being scrutinized with regard to his work performance. Deal Dep. at 133:13-16. Notably, neither plaintiff ever received a negative performance evaluation.

Plaintiffs have not met their burden of supplying "concrete particulars," Meiri, 759 F.2d at 998, to substantiate their claims of hyper-criticism and scrutiny by defendants of their work performance, and the record is thus insufficient to raise a triable issue of fact.

### d.   Letter Accusing Plaintiffs of Arson

Plaintiffs point to a letter sent by Larson on July 27, 2006, to then-District Attorney Swinehart naming Deal and Lahr as suspects in the warehouse fire at the Depot. Swinehart forwarded this letter to the New York State Police. The letter, which was not actually signed by Larson, was summarily dismissed by the State

---

[4]

Spike was plaintiffs' supervisor until he went on medical leave, and then VanCleef was the acting lieutenant. Deal Dep. at 12:15-17.

Police and no further action was taken. Connolly testified that he was not aware that Larson had written the letter. Lahr stated that there were rumors that the letter actually was authored by Larson's wife or by Swinehart.

To falsely accuse someone of arson, let alone any crime or misdeed, is reprehensible. However, Larson was no longer employed by the Sheriff's Department at the time he wrote the letter, and therefore the letter may not be imputed to the Sheriff's Department or Connolly as an act of retaliation by Plaintiffs' employer.

### e. Failure to Offer Plaintiff Deal Certain Work Assignments

Deal alleges that he suffered retaliation by not being offered weekend assignments or details working at Watkins Glen racetrack. Deal states that this began occurring in the summer of 2005, before he engaged in the alleged speech, which began in January 2006. See Deal Dep. at 121:11-16. Deal thus is unable to show the required causal connection between the adverse action and his speech.

Moreover, Deal has not demonstrated that he was entitled to such assignments or that he was given less desirable shifts or work assignments. See Bal v. Hughes, No. 92 Civ. 5453(JFK), 1998 WL 43129, *5 (S.D.N.Y. Feb. 2, 1998)(requiring objective harm for retaliatory conduct to give rise to a constitutional claim); Garber v. New York City Police Dept., No. 95 Civ. 2516(JFK), 1997 WL 525396 (S.D.N.Y. Aug. 22, 1997) (same).

### f.   Swinehart's Attempt to Have Deal Fired

Deal asserts that then-District Attorney Swinehart attempted to have him fired over an incident in which Swinehart accused Deal of shoving a laptop computer at him during a Drug Task Force meeting in 2005. Deal Dep. at 136:4-16; 303. Deal testified that Connolly approached him after the incident and told him that he had initially planned to fire him but had changed his mind and planned to discipline him instead. Deal Dep. at 141:19-142:13. Deal admitted, however, that the conversation ended there, that no adverse employment action was actually taken by Connolly, and that Connolly later confirmed to him that nothing had come of the incident. Id. at 277:15-279:2.  Although petty and vengeful, this conduct by Swinehart cannot be used to show an adverse employment action taken against Deal in retaliation by his employer, because Swinehart was the District Attorney at that time. Swinehart was not, and has never been, Deal's employer or an employee of the Sheriff's Department.

### g.   Swinehart's Attempt to Have Lahr Fired

Lahr testified about an incident in which Swinehart accused Lahr of using the wrong form in a Seneca Falls Town Court matter. See Lahr Dep. at 190. Lahr stated that a private attorney was hired to look into the matter, but Connolly never spoke to him about it. Connolly stated that he recalled the incident, noting that Swinehart believed that Lahr somehow had disrespected him and

requested Connolly investigate the matter. <u>See</u> Affidavit of Leo Connolly ("Connolly Aff.") at 4. Connolly asked John Cleere to look into the matter, who, later the same day, determined the Swinehart's complaint was unfounded.

Swinehart, apparently, was not satisfied and demanded an external investigation be conducted. Connolly Aff. at 4. To Connolly's knowledge, no further external investigation took place, although it was his understanding that a private attorney was hired. <u>Id.</u> at 5. Connolly was never contacted in regards to this incident, and never spoke to Lahr about it because he did not believe Lahr had done anything wrong. <u>Id.</u> at 4-5. Lahr does not dispute that he was never reprimanded or disciplined, and there is no record of any such action in Lahr's personnel file. <u>Id.</u> at 5.

Like the laptop incident, this is another example of Swinehart's pettiness. Although Swinehart's conduct was regrettable, it cannot be used to show an adverse employment action taken against Lahr in retaliation by his employer, because Swinehart was the District Attorney at that time; Swinehart was not, and has never been, Lahr's employer or an employee of the Sheriff's Department. Moreover, as with Deal and the laptop incident, no adverse action was taken against Lahr with regard to this incident.

### h.    Surveillance of Plaintiff Lahr's House

Lahr asserts that his home was subjected to surveillance by an unmarked Sheriff's Department vehicle on one evening. During the incident, the vehicle drove up to the house and shone its headlights through the front window; it then drove away and parked down the street with its lights off. Lahr could not identify the make, model, or license plate number of the vehicle, which he could not say for certain was, in fact, a Sheriff's Department vehicle. At his deposition, Lahr surmised that the driver could have been Zona. According to Lahr, Zona drove a similar car.

Even assuming <u>arguendo</u> this incident could constitute retaliatory treatment, the details are not sufficiently specific to impute it to any of the defendants. First, Lahr admitted that Zona may have been working for the SCDA's office as an investigator at the time of the headlight incident. Lahr Dep. at 172-77. Second, even assuming that Zona was working for the Sheriff's Department at the time, the conduct cannot be imputed to any of Lahr's supervisors as Lahr has submitted no evidence that Connolly or Larson, or anyone superior to him in the Sheriff's Department hierarchy, knew or should have known that Zona, one of their subordinates, was retaliating against Lahr; ordered Zona to retaliate against Lahr, or created a policy or custom of permitting retaliation for plaintiffs' exercise of their First Amendment rights. <u>See</u> <u>Brenes v. City of N.Y.</u>, No. 07-5549-CV, 2009 WL 742163,

at *2 (2d Cir. Mar. 23, 2009) (unpublished opn.) (holding that there was inadequate evidence in the record to support plaintiff's First Amendment retaliation claim against supervising defendants, where, inter alia, there was no evidence that the defendants "knew or should have known that their subordinates were retaliating against [plaintiff], ordered their subordinates to retaliate against [plaintiff], or created a policy or custom of permitting retaliation for teachers' exercise of their First Amendment rights") (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] § 1983.") (quotations and citations omitted)). As such, the incident involving the alleged surveillance cannot be used in support of plaintiffs' First Amendment retaliation claim.

### i.   Accusation of Stealing Directed at Lahr

Lahr points to an incident in which he was accused by a subordinate officer in the department, Constable, of stealing a "white suit", which presumably was a winter camouflage suit. Lahr testified that he believed Constable was responsible because he was angry at being a target of plaintiffs' investigation. See Lahr Dep. at 165. The accusation against Lahr was wholly unfounded and nothing came of it.

This incident cannot be used to support Lahr's retaliation claim because Lahr has submitted no evidence that Connolly or Larson, or anyone superior to him in the Sheriff's Department hierarchy, knew or should have known that Constable, one of their subordinates, was retaliating against Lahr; ordered Constable to retaliate against Lahr, or created a policy or custom of permitting retaliation for plaintiffs' exercise of their First Amendment rights. See Brenes v. City of N.Y., 2009 WL 742163, at *2; Colon v. Coughlin, 58 F.3d at 873.

### j.   Cumulative Effect of Incidents

While relatively de minimis incidents standing alone will not give rise to a First Amendment retaliation claim, "a combination of seemingly minor incidents [may] form the basis of a constitutional retaliation claim once they reach a critical mass" and create "a working environment unreasonably inferior to what would be considered normal for that position." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). As discussed above, a number of the adverse actions are not attributable to plaintiffs' employers and therefore cannot form the basis of a retaliation claim. Others occurred before the allegedly protected speech and therefore cannot be said to have been done in retaliation for the speech. After considering cumulatively the remaining adverse actions alleged by plaintiffs, the Court cannot find that they created an objectively and unreasonably inferior workplace as compared to a typical-not

ideal-workplace. See Phillips, 278 F.3d at 109 ("[I]n order to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.").

**3.     Whether the instances of speech were protected under the First Amendment**

In light of the Court's foregoing discussion regarding the "adverse action" and "causation" prongs of the First Amendment retaliation standard, the "protected speech" element need not be decided, and the Court declines to do so. See DeFilippo v. New York State Unified Court System, No. 00CV2109(NGG)(JMA), 2006 WL 842400, at *19 (E.D.N.Y. Mar. 27, 2006) ("Because I have held that the speech for which Plaintiff claims he was retaliated against is not protected by the First Amendment, the element of causation need not be decided.") (footnote omitted). Because the Court has held that there exists "no genuine issue of material fact[,]" Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 368 (2d Cir. 2003) (emphases in original) (quoting Anderson v. Liberty Lobby, 477 U.S. at 247-48), on two of the necessary elements for a First Amendment retaliation claim (adverse employment action and causation),

defendants' motions for summary judgment on plaintiffs' First Amendment retaliation claims are granted.

## V.    Intentional Infliction of Emotional Distress

Plaintiffs' original Complaint included a claim for intentional infliction of emotional distress. The County, the Sheriff's Department, and Larson initially moved to dismiss under Rule 12(b)(6), while Connolly interposed an Answer in lieu of moving to dismiss any of the claims. By Decision and Order entered May 8, 2008, the Court dismissed plaintiffs' claims for intentional infliction of emotional distress against the County and the Sheriff's Department on the ground that such a claim may only be brought against individual defendants. The Court also dismissed plaintiffs' IIED claims against Larson on the ground that the alleged conduct did not rise to the level of outrageousness required by the case law.

Plaintiffs' Amended Complaint alleges that Defendants engaged in extreme and outrageous conduct in conducting a campaign of systematic harassment of the Plaintiffs, with the intent to cause, or in disregard of the probability that their conduct would cause, severe emotional distress; and that Defendants' conduct did cause severe emotional distress. New York sets a "strict standard" for claims of IIED. Murphy v. American Home Prod. Corp., 58 N.Y2d 293, 303 (1983). Only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

-30-

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" is actionable. Id. (quotation omitted).

Applying these principles to plaintiffs' allegations, and construing the record in the light most favorable to them, the Court concludes that summary judgment dismissing the IIED claim against Connolly is warranted because the occurrences do not rise to the required level of extreme and outrageous conduct. Notably, neither plaintiff identified a single instance in which Connolly subjected him to extreme, outrageous, and atrocious conduct falling outside the bounds of decency.

Plaintiff Deal testified that Connolly reprimanded him on one occasion during the four years of Connolly's tenure as Sheriff. This was in regards to "the laptop incident," wherein Swinehart accused Deal of shoving a laptop computer at him during a Drug Task Force meeting in 2005. As noted above, Deal testified that Connolly approached him after the incident and told him that he had initially planned to fire him for assaulting Swinehart with the laptop, but he changed his mind and planned to discipline him instead. Deal admitted that there was no further conversation about the episode. Deal also admitted that Connolly took no disciplinary or other adverse employment action and later confirmed to him that nothing resulted from the incident.

Connolly independently recalled one other incident when he asked Deal to dress more formally the next time he was working with

the FBI on an investigation. Deal, however, did not testify about this occasion at all.

Lahr admitted that Connolly never spoke directly to him about his work performance, his investigations, or his related speech. Lahr did not testify that Connolly personally ever reprimanded, disciplined, suspended, terminated, or undertook any other adverse employment action against him.

Plaintiffs have come forward with no evidence of any extreme or outrageous conduct by Connolly against them that was intended to cause or was likely to cause emotional distress, and therefore their claim for intentional infliction of emotional distress must be dismissed.

## VI. Conclusion

For the reasons discussed above, defendants' Motions for Summary Judgment (Docket No. 98 (Motion for Summary Judgment by Leo T. Connolly); Docket No. 109 (Motion for Summary Judgment by James Larson) & Docket No. 113 (Motion for Summary Judgment by Seneca County and the Seneca County Sheriff's Department)) are granted in their entirety. Plaintiffs' Amended Complaint (Docket No. 65) is dismissed with prejudice in its entirety. The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

S/Michael A. Telesca

_____
   MICHAEL A. TELESCA
United States District Judge

DATED:     January 4, 2012
           Rochester, New York

-32-